AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

|  |  |
|---|---|
| United States of America | ) |
| v. | ) |
| ELIAS VALDEZ | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |

**FILED**

Oct 23 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

Case No. **CR 25-71254-MAG**

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ August 22, 2025 _____ in the county of _____ Santa Clara _____ in the
_____ Northern _____ District of _____ California _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(A) | Distribution of 400 Grams or More of a Mixture or Substance Containing a Detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, Commonly Known as Fentanyl |

This criminal complaint is based on these facts:

See declaration of DEA SA Joshua Serafin.

☑ Continued on the attached sheet.

/s/

*Complainant's signature*

Approved as to form _____/s/
Backhus AUSA

DEA SA Joshua Serafin

*Printed name and title*

Sworn to before me by telephone.

Date:  _____ 10/23/2025 _____

*Judge's signature*

City and state:  _____ San Jose, CA _____

Hon. Nathanael M. Cousins, U.S. Magistrate Judge

*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**</u>

I, Joshua Serafin, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, hereby state as follows:

**INTRODUCTION**

1.      The DEA has been investigating the drug trafficking activities of Elias VALDEZ, Jonathan LUCERO-PEACE, William HUYNH, Alejandro PELAYO-GONZALEZ, and Julio Jovan VASQUEZ-OCHOA, and others, in San Jose, California, which is within the Northern District of California.

2.      I submit this affidavit in support of five (5) applications for criminal complaints and arrest warrants charging each of the below proposed defendants with one count each.  As such, this affidavit provides probable cause to believe that the following individuals committed the following federal offense on the following date:

| Proposed defendant: | Offense: | Date: |
|---|---|---|
| William HUYNH | 21 U.S.C. § 841(a)(1), (b)(1)(A) – Distribution of and Possession with Intent to Distribute 100 Grams or More of a Mixture or Substance Containing a Detectable Amount of carfentanil, a Schedule II controlled substance, and an analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl) (One Count) | On or about January 10, 2025 |
| Jonathan LUCERO-PEACE | 21 U.S.C. § 841(a)(1), (b)(1)(A) – Distribution of and Possession with Intent to Distribute 100 Grams or More of a Mixture or Substance Containing a Detectable Amount of carfentanil, a Schedule II controlled substance, and an analogue of N-phenyl-N-[1-(2-phenylethyl)-4- | On or about February 26, 2025 |

1

| | | |
|---|---|---|
| | piperidinyl] propanamide (fentanyl) (One Count) | |
| Alejandro PELAYO-GONZALEZ | 21 U.S.C. § 841(a)(1), (b)(1)(A) – Distribution of and Possession with Intent to Distribute 100 Grams or More of a Mixture or Substance Containing a Detectable Amount of carfentanil, a Schedule II controlled substance, and an analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl) (One Count) | On or about February 26, 2025 |
| Julio Jovan VASQUEZ-OCHOA | 21 U.S.C. § 841(a)(1), (b)(1)(A) – Distribution of and Possession with Intent to Distribute 50 Grams and More of Actual Methamphetamine (One Count) | On or about March 27, 2025 |
| Elias VALDEZ | 21 U.S.C. § 841(a)(1), (b)(1)(A) – Distribution of 400 Grams or More of a Mixture or Substance Containing a Detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, Commonly Known as Fentanyl (One Count) | On or about August 22, 2025 |

3.      As detailed below, based on the information and evidence available to me, I believe that VALDEZ is a significant source of supply of narcotics – specifically, fentanyl, carfentanil, and methamphetamine – in the San Jose area. VALDEZ is believed to supply distributable amounts of narcotics to HUYNH and LUCERO-PEACE, as mid-level narcotics dealers. HUYNH then redistributes these narcotics for further profit. LUCERO-PEACE works with PELAYO-GONZALEZ and VASQUEZ-OCHOA to do the same – that is, to redistribute the large amounts of narcotics received from VALDEZ for profit. Each of the five (5) proposed

defendants appear to be acting within the same criminal drug trafficking organization, though this affidavit is submitted in support of five (5) separate applications for criminal complaints and arrest warrants to be issued for all five (5) individuals.

4.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, information from records and databases, and information obtained from other law enforcement officers and witnesses.  Because this affidavit is submitted for the limited purpose of a criminal complaint, I have not included each fact known to me about this case; rather, I have set forth the facts I believe are sufficient to support probable cause for the criminal complaints.

## AFFIANT BACKGROUND

5.      I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA"), and have been so employed since February of 2023.  I am currently assigned to the San Francisco Division at the San Jose Resident Office.

6.      I have successfully completed a nineteen-week DEA Basic Agent Training Academy at the DEA Academy in Quantico, Virginia.  This training included instruction in the investigation of federal drug violations, including, but not limited to Title 21, United States Code Sections 841 and 846.  Additionally, this training included (but was not limited to) several hundred hours of comprehensive, formalized instruction in drug identification, detection, interdiction, financial investigations and money laundering, identification and seizure of drug related assets, undercover operations, and electronic and physical surveillance procedures.

7.      During my employment, I have participated in a number of narcotics and financial investigations.  I have debriefed defendants, confidential sources, and witnesses who had personal knowledge regarding narcotics trafficking organizations.  In addition, I have discussed with numerous law enforcement officers, and confidential sources, the methods and practices used by narcotics traffickers.  I also have participated in many aspects of drug and financial investigations including, but not limited to, undercover operations, telephone toll analysis, records research, and physical and electronic surveillance.  Moreover, I have assisted on the

execution of several federal and state search and arrest warrants that resulted in the arrest of suspects and seizure of narcotics and assets.

8.    Through my training, education, experience, and my conversations with other agents and officers who conduct drug investigations, I have become familiar with narcotics traffickers' use of mobile telephones, and their use of numerical codes and code words to conduct their business.  Also, I have become familiar with narcotics traffickers' methods of operation, including, but not limited to, the manufacturing, distribution, storage, and transportation of narcotics, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

## APPLICABLE LAW

9.    Pursuant to 21 U.S.C. § 841(a)(1) and 841(b)(1)(A), it is unlawful to knowingly distribute and possess with intent to distribute specified quantities of a controlled substance, including carfentanil (100 grams and more of a mixture and substance), fentanyl (400 grams and more of a mixture and substance), and methamphetamine (50 grams and more of actual substance).  Carfentanil, fentanyl, and methamphetamine are federally controlled substances.

## STATEMENT OF PROBABLE CAUSE

The below paragraphs outline various controlled purchases and other meetings conducted by a DEA Confidential Source (CS)[1], at the direction of agents/officers.

**December 6, 2024 transaction for counterfeit M-30 fentanyl pills involving HUNYH**

---

[1] The CS has a criminal record which includes the following: (1) assault with a deadly weapon (conviction); (2) possession with intent to distribute methamphetamine (arrest).  The CS is currently cooperating in exchange for consideration of reduced sentences for current federal criminal charges related to narcotics trafficking. DEA agents believe the CS has supplied them information that is truthful thus far. Since 2022, DEA agents have corroborated information that the CS has provided.

The CS has had a long-term personal and business (narcotics trafficking) relationship with VALDEZ, HUNYH, and LUCERO-PEACE prior to this investigation.

10.     Leading up to December 6, 2024, at the direction of agents/officers, the CS telephonically[2] contacted an individual going by the name "Billy," later identified as HUYNH[3]. These communications included phone communications through encrypted messaging services such as Signal, Telegram, and WhatsApp.  During these telephonic interactions, HUYNH told the CS that HUYNH could do $1,500 a "boat" of "blues."  Based upon my training and experience, I know that a "boat" is slang for one thousand pills.  Based upon my training and experience, I know that "blues" are slang for counterfeit M-30 pills that usually contain fentanyl. Further, with context, I understood that HUYNH was informing the CS that HUYNH would sell the CS two thousand counterfeit M-30 pills for $3,000.  The price quoted by HUYNH—*i.e.*, $3,000—is consistent with the pricing of two thousand counterfeit M-30 fentanyl pills in the San Jose area.  The CS agreed to the price and on December 6, 2025, DEA San Jose Resident Office agents/officers utilized the CS to complete a controlled purchase of approximately two thousand counterfeit M-30 fentanyl pills for three thousand Official Advanced Funds (OAF).  During the controlled transaction, HUYNH was identified as the individual delivering the narcotics to the CS via covert remote camera located inside the CS's vehicle.  Due to the challenges associated with testing fentanyl in the field, investigators transferred the seized M-30s to the Western

----

[2] Per the CS, HUYNH, LUCERO-PEACE, VADLEZ, and PELAYO-GONZALEZ, all use encrypted applications, including Telegram, Signal, and WhatsApp, to conduct their narcotics related communications. Most of the communication is via encrypted text message services or audio messages through a WhatsApp thread. Due to these platforms end to end encryption and security restrictions, the CS cannot directly record Telegram/Signal audio calls through the platform or through the CS's physical phone; instead, the only method for the CS to record Telegram/Signal audio calls is by using a separate recording device. Therefore, agents provided the CS with a recording device and directed the CS to record pertinent narcotics-related phone communications and any in-person meetings with individuals discussing narcotics-related activities. However, due to the non-discreet nature of using a recording device and to the spontaneous nature of some conversations, the CS has not been able to record each and every conversation with the aforementioned individuals. Despite this hurdle, the CS has been directed to inform his/her agent handlers every time that he/she meets with or talks to the aforementioned individuals or other individuals who discussed illicit narcotics activity with the CS.

[3] HUYNH's identification as "Billy" was based on, among other things, a combination of physical surveillance, CS information, and the California DMV database photograph comparisons.  Agents identified HUYNH's address based on telephone GPS ping location information.

Regional Laboratory, where subsequent analysis of the M-30s showed they contained fentanyl 216.0g + or – 0.2g.

**January 10, 2025 transaction for counterfeit M-30 carfentanil pills involving HUNYH**

11.     Leading up to January 10, 2025, at the direction of agents/officers, the CS contacted HUYNH telephonically and ordered another two thousand fentanyl pills from HUYNH. The CS also asked for the price of "addys."  Based on my training and experience, I know that "addys" are slang for counterfeit Adderall pills which usually contain methamphetamine.  In summary and relevant part, HUYNH responded by saying that was able to complete the requested two thousand counterfeit M-30 pill transaction, and that he would ask "Eli" regarding the price of the "addys." HUYNH eventually told the CS that "addys" would be "5."  Based on my training and experience, I believe that "Eli" is Elias VALDEZ, a polydrug vendor based out of San Jose, CA, who ships large amounts of narcotics via USPS mail across the U.S.  Furthermore, based on my training and experience, "5" refers to five thousand dollars per one thousand counterfeit Adderall pills.

12.     Based on the above-described agreement, on January 10, 2025, DEA San Jose Resident Office agents/officers utilized the CS to complete a controlled purchase of approximately two thousand counterfeit M-30 fentanyl pills for three thousand OAF.  During the transaction, at approximately 12:49pm, an FBI Special Agent identified HUYNH as he exited the front door of a residence in San Jose, California, carrying a white plastic bag in his right hand. Shortly thereafter, an agent observed as HUYNH entered the front passenger seat of a 2008 grey Ford Edge.  Surveillance was maintained on the Ford Edge as it traveled to Safemoon Smoke Shop, 4280 Senter Rd, San Jose, California.  At approximately 12:55pm, a surveillance agent observed HUYNH briefly exit the Ford Edge, enter Safemoon Smoke Shop, and return to the Ford Edge.  Shortly thereafter, the surveillance agent observed the Ford Edge depart the area. Surveillance was maintained on the Ford Edge until it arrived at the deal location.  At approximately 1:12pm, a DEA Task Force Officer ("TFO") observed the Ford Edge arrive at the deal location, park adjacent to the CS vehicle, and HUYNH exit the front passenger seat of the

Ford Edge carrying a white plastic bag.  Shortly thereafter, the TFO observed HUYNH enter the front passenger seat of the CS vehicle.  Shortly thereafter, per covert video/audio recording equipment, I observed HUYNH sit in the front passenger seat of the CS vehicle, exchange pleasantries with the CS, and hand the CS a white plastic bag. The CS paid HUYNH the OAF, and HUYNH count the OAF.  Shortly thereafter, I observed HUYNH exit the front passenger seat of the CS vehicle.  A TFO then observed HUYNH walk towards the Ford Edge, enter the front passenger seat, and the Ford Edge depart the deal location.  The white bag was seized, which contained suspected M-30 pills. Due to the challenges associated with testing fentanyl in the field, investigators transferred these seized M-30s to the Western Regional Laboratory, where subsequent analysis of the pills showed they were positive for a mixture and substance of carfentanil with a total net weight of 210.4g + or – 0.2g.

### February 26, 2025 transaction for counterfeit M-30 carfentanil pills involving LUCERO-PEACE and PELAYO-GONZALEZ

13.     Leading up to February 26, 2025, at the direction of agents/officers, the CS contacted "JP," a nickname for LUCERO-PEACE,[4] telephonically and attempted to order approximately six thousand counterfeit Adderall pills.  LUCERO-PEACE stated he was unable to broker a transaction for the Adderall pills; however, he was able to broker a transaction for what agents believe were six thousand counterfeit M-30 (fentanyl) pills.  Moreover, LUCERO-PEACE requested a broker's fee of $30 for each of the one thousand pills, which would total $180 for six thousand pills.  The CS agreed to the narcotics transaction and the broker's fee.  The CS and LUCERO-PEACE agreed to $500 dollars per 1,000 pills.

---

[4] "JP" has been identified as Jonathan LUCERO-PEACE through physical surveillance, previous DEA investigations, and California DMV database photograph comparisons. On or about March 17, 2023, DEA agents arrested LUCERO-PEACE pursuant to a state arrest warrant. LUCERO-PEACE was charged in a state case on California Code Health and Safety Code-11351- Possession for Sale of Controlled Substance, 11352- Transportation/Sale Controlled Substance, and California Penal Code Section 26500- Sale of Firearm Without a License, stemming from conduct including the same sale of firearm and counterfeit M-30 (fentanyl) pills. Subsequently, LUCERO-PEACE was sentenced in the state case to 10 months' time served and a term of probation until October 27, 2025.

14.     On February 26, 2025, the CS contacted LUCERO-PEACE and requested the telephone number of the individual who would be delivering these narcotics to the CS and an undercover law enforcement officer ("UC"), who had been introduced as a someone who was going to be providing the purchase money for the transaction.  LUCERO-PEACE gave the CS a telephone number and stated the individual's name was "WAR."  "WAR" has been identified as Alejandro PELAYO-GONZALEZ through California probation records, physical surveillance, and California DMV database photograph comparisons.  The CS contacted WAR/PELAYO-GONZALEZ telephonically and arranged to meet on Landess Ave. in San Jose, California, as the buy location.  While conversing with WAR/PELAYO-GONZALEZ through Signal chat, the CS observed that WAR/PELAYO-GONZALEZ's Signal username was "Dro Dawg."  Shortly before the deal, WAR/PELAYO-GONZALEZ contacted the CS and stated he only had five thousand pills available for sale.  The CS responded by agreeing to the five thousand pill transaction.

15.     At approximately 5:02pm, agents/officers observed a silver Toyota Scion arrive at the deal location, and park adjacent to the UC vehicle.  Surveillance, the CS, and the UC observed that PELAYO-GONZALEZ was driving the silver Toyota Scion and that there was an unknown Hispanic adult female in the front passenger seat of the silver Toyota Scion.  Shortly thereafter, the UC observed the CS exit the front passenger door of the UC vehicle and begin conversing with PELAYO-GONZALEZ.  In summary and relevant part, the CS attempted to invite PELAYO-GONZALEZ to enter the rear seat of the UC vehicle to conduct the transaction, but PELAYO-GONZALEZ refused. Eventually, the CS walked to the front driver's side door of the silver Toyota Scion to conduct the transaction.  Shortly thereafter, the CS and PELAYO-GONZALEZ had a disagreement regarding the narcotics transaction.  Specifically, per the CS, he/she asked PELAYO-GONZALEZ to see the narcotics, to which PELAYO-GONZALEZ stated he wanted to count the money first.  Per the CS, PELAYO-GONZALEZ told the CS that he was "Eli's" boy (believed to be a reference to VALDEZ) and that he wanted to count the money first. The CS responded by telling him that he/she was "Eli's boy first" and that he/she

wanted to see the narcotics.  Per the CS, PELAYO-GONZALEZ then handed a plastic grey Walmart bag to the CS and the CS handed PELAYO-GONZALEZ $2,500 OAF.  Shortly thereafter, surveillance observed the CS return to the UC vehicle carrying the grey Walmart bag. Inside the grey Walmart bag were two clear plastic baggies containing blue circular cylindrical pills.  At approximately 5:05pm, surveillance observed PELAYO-GONZALEZ depart from the deal location in the silver Toyota Scion.

16.    Due to the challenges associated with testing fentanyl in the field, investigators transferred the seized pills to the Western Regional Laboratory, where subsequent analysis of the pills showed they were positive for a mixture and substance of carfentanil with a net weight of 536.0g + or – 0.2g.



*Figure 1 TWO CLEAR PLASTIC BAGGIES CONTAINING BLUE CIRCULAR CYLINDRICAL PILLS ALTOGETHER CONTAINED WITHIN A GREY PLASTIC WALMART BAG. SUBSEQUENT LAB TESTING REVEALED THE PILLS CONTAINED CARFENTANIL 536.0g + OR - 0.2g*

**March 11, 2025 meeting between the CS and LUCERO-PEACE**

17.    Leading up to March 11, 2025, at the direction of agents/officers, the CS contacted LUCERO-PEACE telephonically and requested to meet so the CS could pay LUCERO-PEACE the previously requested broker fee.  LUCERO-PEACE agreed to the meet and provided the CS the following address: "2009 Admiral Place."  On March 11, 2025, surveillance units, the UC vehicle, the UC, and CS arrived in the area of Admiral Place in San Jose, California.  At approximately 2:24pm, a TFO observed LUCERO-PEACE approach the UC vehicle.  A TFO observed LUCERO-PEACE enter the rear passenger door of the UC vehicle.  The UC and CS exchanged pleasantries with LUCERO-PEACE and began conversing.  In summary and relevant part, the UC, CS, and LUCERO-PEACE discussed shipping narcotics through out of state mailing services.  LUCERO-PEACE stated that his "boy Eli" (believed to be VALDEZ) had been very successful at this delivery technique - enough so that Eli decided to move to Mexico.  LUCERO-PEACE further elaborated that Eli's girlfriend was from Mexico, and that Eli was a middleman who brokered numerous narcotics transactions from Mexico.  However, LUCERO-PEACE stated most of Eli's business was in the Bay Area, due to Eli being from the Bay Area.  LUCERO-PEACE stated that "Dro Dawg," the individual who had delivered the counterfeit M-30 fentanyl pills, was working for Eli.  Shortly thereafter, the UC paid LUCERO-PEACE $200 OAF for brokering the February 26, 2025, narcotics deal and requested LUCERO-PEACE's Telegram account.  LUCERO-PEACE agreed and gave the UC his Telegram account information.  At approximately 2:29pm, LUCERO-PEACE exited the UC vehicle.  Shortly thereafter, a TFO observed LUCERO-PEACE walk eastbound away from the vehicle.

**March 27, 2025 transaction for counterfeit Adderall pills containing methamphetamine involving LUCERO-PEACE and VASQUEZ-OCHOA**

18.    Leading up to March 27, 2025, the UC telephonically contacted LUCERO-PEACE and in summary and relevant part, requested approximately 5,000 counterfeit Adderall pills.  LUCERO-PEACE responded by offering multiple prices of pills depending on the quality

of the pill. The UC and LUCERO-PEACE discussed different prices, pill shapes, pill colors, pill batches, and presses in their communication. Based on my training and experience, I believe narcotics traffickers routinely discuss their own narcotics quality, quantity, and production methods with potential clients to heighten chances to make a narcotics sale. The UC and LUCERO-PEACE agreed to a counterfeit Adderall purchase of approximately five thousand pills for $3,125.

19.     On March 27, 2025, the UC contacted LUCERO-PEACE and discussed meeting at the deal location near Berryessa Rd. in San Jose, California. After deliberations, LUCERO-PEACE agreed to meet the UC if the UC would pay LUCERO-PEACE an extra $100 as a broker fee. Additionally, LUCERO-PEACE stated that the UC and LUCERO-PEACE would be meeting with two individuals who would be sourcing the narcotics. At approximately 3:40pm, the UC, UC vehicle, and surveillance set up near Berryessa Rd. At approximately 4:13pm, another TFO who was conducting surveillance in Milpitas, observed LUCERO-PEACE exit the front door of a residence in Milpitas, California and enter a silver Lexus LS. Surveillance was maintained on LUCERO-PEACE as he drove the silver Lexus southbound on Interstate 680 to the Berryessa Rd. location, without any meet ups or prolonged stops.

20.     At approximately 4:33pm, another TFO observed the silver Lexus arrive at the Berryessa Rd. location, and park in the parking lot. Shortly thereafter, the TFO observed LUCERO-PEACE exit the front driver's side door of the silver Lexus LS, walk towards the UC vehicle, and enter the front passenger side door of the UC vehicle. Shortly thereafter, the UC and LUCERO-PEACE exchanged pleasantries and conversed while awaiting the two individuals LUCERO-PEACE stated would be sourcing the narcotics. While awaiting the narcotics delivery, in summary and relevant part, LUCERO-PEACE and the UC discussed LUCERO-PEACE's probation status, LUCERO-PEACE's past pill pressing operation, and LUCERO-PEACE's weariness of law enforcement informants and covert tech equipment. LUCERO-PEACE also told the UC that his source was driving a Prius.

21.    At approximately 4:40pm, LUCERO-PEACE called an individual suspected to be the source of the narcotics and requested his timeline for arriving. In summary and relevant part, the individual told LUCERO-PEACE that they were 15-20 minutes out. At approximately 4:58pm, LUCERO-PEACE called the individual again and requested an update. The individual responded that they were in motion. Furthermore, the individual requested LUCERO-PEACE to move the location of the deal to another location. The UC refused and stated the arrangement of the extra $100 payment was for having the deal take place at Berryessa Rd. LUCERO-PEACE responded that his source was scared of law enforcement and had been involved in a narcotics sting operation in the past.

22.    At approximately 5:14pm, surveillance observed a blue Toyota Prius, with registered owners including Julio Jovan VASQUEZ-OCHOA circling the deal location parking lot. Based on my training and experience, I believe narcotics traffickers often engage in counter surveillance techniques such as circling a parking lot before a narcotics transaction to see if law enforcement personnel are present. Shortly thereafter, a TFO observed the blue Prius park in the lot, and an adult Hispanic male – later identified as Julio Jovan VASQUEZ-OCHOA[5] – exit the front driver's door and enter the rear door of the UC vehicle. The UC, VASQUEZ-OCHOA, and LUCERO-PEACE exchanged pleasantries inside the UC vehicle. Shortly thereafter, VASQUEZ-OCHOA placed a brown Taco Bell bag on the center console of the UC vehicle. The UC looked inside the Taco Bell bag and observed several Ziplock style bags filled with orange pills inside. The UC then handed VASQUEZ-OCHOA $3,125 of OAF, and the UC observed as VASQUEZ-OCHOA counted the OAF. VASQUEZ-OCHOA then stated that the pills came out better than the more expensive kind. VASQUEZ-OCHOA asked the UC if the pills looked good, and the UC agreed. Shortly thereafter, VASQUEZ-OCHOA asked LUCERO-PEACE still wanted the gram. LUCERO-PEACE agreed and stated he needed that, and both individuals exited the UC vehicle. Based on my training and experience, I believe narcotics

---

[5] The adult Hispanic male who sourced the counterfeit Adderall pills to the UC on March 27, 2025, was identified as Julio Jovan VASQUEZ-OCHOA by physical surveillance, law enforcement databases, and California DMV photograph comparison.

traffickers use terminology such as gram and ounce to denote different quantities of narcotics for sale and consumption.

23.    At approximately 5:15pm, a TFO observed VASQUEZ-OCHOA and LUCERO-PEACE exit the UC vehicle. Shortly thereafter, I observed the blue Pruis conduct counter surveillance in the parking lot and a surveillance agent observed the blue Pruis eventually park in a different stall.  At approximately 5:33pm, another TFO observed VASQUEZ-OCHOA drive the blue Prius away from the deal location and head eastbound on Berryessa Rd. Investigators transferred the seized suspected counterfeit Adderall pills to the Western Regional Laboratory, where subsequent analysis of the pills showed a net weight of 2163.5g + or – 0.5g methamphetamine, and an amount of pure substance of 88.7g + or – 11.0g.



*Figure 1 BROWN TACO BELL BAG CONTAINING FIVE SEPARATE ZIPLOCK STYLE BAGS EACH CONTAINING ORANGE PILLS WHICH TESTED POSITIVE FOR METHAMPHETAMINE 88.7G +OR- 11.0G*

24.    On April 9, 2025, the UC contacted LUCERO-PEACE telephonically and requested to meet so that the UC could pay LUCERO-PEACE the $100 broker fee that the UC forgot to pay during the March 27, 2025 narcotics transaction.  In summary and relevant part, LUCERO-PEACE stated he was available to meet and gave the UC Milpitas Golf Land as a location to meet. The UC agreed, and surveillance and the UC set up at the Milpitas Golf Land parking lot at approximately 3:35pm.  At approximately 3:45pm, the UC observed LUCERO-PEACE driving his silver Lexus LS into the parking lot.  Shortly thereafter, surveillance observed as LUCERO-PEACE parked adjacent to the UC vehicle's front driver's side door and

exchanged pleasantries with the UC.  Shortly thereafter, in summary and relevant part, the UC
and LUCERO-PEACE briefly conversed regarding the previous narcotics transaction and the UC
handed LUCERO-PEACE $100 OAF.  LUCERO-PEACE took the OAF and departed the area.
At approximately 3:48pm, a surveillance agent observed LUCERO-PEACE drive his silver
Lexus LS westbound on Jacklin Rd.

### July 17, 2025, 2025 transaction for counterfeit M-30 carfentanil pills involving HUYNH and VALDEZ

25.     Leading up to July 17, 2025, at the direction of agents/officers, the CS contacted
HUYNH telephonically and, in summary and relevant part, requested an approximately five
thousand counterfeit M-30 pill purchase to be completed when the CS had appropriate funding.
HUYNH agreed to the proposition.  During the negotiations for the price of the counterfeit pills,
the CS asked HUYNH to ask "Eli" (referring to VALDEZ) for a better price on the pills. The CS
and HUYNH agreed on a price of $775 per one thousand pills ($3,875 for five thousand pills).
HUYNH told the CS that a residence on Serenade Way in San Jose would be the meet location,
to which the CS agreed.

26.     On July 17, 2025, at approximately 2:05pm, surveillance was established near
Serenade Way.  At approximately 2:47pm, a TFO observed HUYNH inside the garage of a
residence on Serenade Way going through various drawers.  At approximately 2:51pm, the TFO
observed HUYNH exit the garage and run across the street (Serenade Way) to the front
passenger side door of the CS's vehicle, which had recently parked adjacent to that location.
Shortly thereafter, a TFO observed HUYNH enter the front passenger seat of the CS vehicle.  At
approximately 2:52pm, using covert tech equipment located inside the CS vehicle, I observed
HUYNH and the CS exchange pleasantries.  I observed HUYNH request the CS pull the CS
vehicle forward, and the CS obliged.  I observed HUYNH remove a black bag from HUYNH's
righthand pocket of his shorts and place it on the center console between HUYNH and the CS.
The CS and HUYNH conversed, and in summary and relevant part, HUYNH requested the
aforementioned price of $3,875, and the CS handed HUYNH $3900 OAF.  Shortly thereafter, the

CS asked HUYNH to provide him/her with VALDEZ's telephone number, to which HUYNH responded by saying HUYNH was going to have to message him (VALDEZ) first to see if it was okay.  During this conversation, I observed the CS brandish an additional $300 OAF (as directed by agents/officers) as a payment for potentially providing VALDEZ's contact information. Shortly thereafter, I observed HUYNH call a number on his phone.  I observed HUYNH telephonically converse with an adult male, later identified as VALDEZ.[6]  In summary and relevant part, HUYNH asked VALDEZ if HUYNH was able to share VALDEZ's telephone number with the CS.  During the conversation, the CS spoke with VALDEZ and gave a ruse reason as to why he/she needed VALDEZ's contact information: the CS's narcotics supplier was no longer living in the area and the CS wanted to be sourced directly by VALDEZ.  VALDEZ agreed and told HUYNH that he could share his contact with the CS.  Shortly thereafter, I observed the CS hand HUYNH the $300 OAF for being able to provide the contact information.

27.     Shortly thereafter, I observed HUYNH and VALDEZ continue to converse over speakerphone.  In summary and relevant part, VALDEZ stated he was going to come visit HUYNH in approximately ten to fifteen minutes.  HUYNH agreed and departed the CS vehicle. At approximately 2:55pm, a TFO observed HUYNH exit the front passenger door of the CS vehicle and walk back towards the residence on Serenade Way.

---

[6] Elias VALDEZ's identification was based among other things, recorded audio messages compared to the communications VALDEZ had with HUYNH and the CS during the July 17, 2025, narcotics transaction, physical surveillance, and comparisons with California DMV photographs.

28.     Shortly thereafter, surveillance observed the CS vehicle depart the area. The black bag obtained from HUYNH contained five individual plastic Ziplock style bags containing numerous small blue pills altogether contained within a plastic vacuum sealed style bag. Due to the challenges associated with testing fentanyl in the field, investigators transferred the seized pills to the Western Regional Laboratory, where subsequent analysis of the pills showed they were positive for a mixture and substance containing carfentanil with a net weight of 545.7g + or – 0.2g.

29.     At approximately 3:31pm, a TFO observed a white Mercedes Benz SUV pull into the driveway of the Serenade Way residence.  Shortly thereafter, the TFO observed HUYNH exit the garage of the Serenade Way residence, walk to the front driver's window of the white



*Figure 2 BLACK BAG CONTAINING FIVE ZIPLOCK STYLE BAGS CONTAINING NUMEROUS SMALL BLUE PILLS ALL TOGETHER CONTAINED WITHIN A PLASTIC VACUUM SEALED STYLE BAG-COUNTERFEIT PILLS TESTED POSITIVE FOR CARFENTANIL 545.7G +OR- 0.2G*

Mercedes, and begin conversing with the driver, later identified as VALDEZ.  Shortly thereafter, surveillance observed HUYNH appear to place his right hand inside the open front window of the white Mercedes.  Based on my training and experience, I believe retail level narcotics dealers

are supplied by sources of supply, who in turn take a large portion of the profits from the retail level dealer.  I believe VALDEZ visited HUYNH shortly after the narcotics transaction to pick up his share of the profits.

30.    After the transaction, at the direction of agents/officers, the CS attempted to contact VALDEZ via the telephone number given to him/her by HUYNH using WhatsApp as the medium for communication.  The CS and VALDEZ had difficulties interacting due to an error in the required password needed for WhatsApp communications.  However, on July 28, 2025, VALDEZ was able to accept the CS as a contact.  The CS and VALDEZ began discussing the narcotics transaction discussed below.

**August 22, 2025 transaction for counterfeit M-30 fentanyl pills involving VALDEZ**

31.    On August 13, 2025, VALDEZ telephonically contacted the CS and, in summary and relevant part, VALDEZ discussed various prices and stated he would have twenty-five to thirty thousand counterfeit M-30 pills in the San Jose area in the near future.  Moreover, VALDEZ offered to ship pills to the CS or for the CS to pick pills up "in so cal" for a discounted price.  VALDEZ told the CS that he could ship the narcotics in a day or two, and that VALDEZ had ways of keeping the package of narcotics undetectable by law enforcement.  Also, VALDEZ stated he "joined the Mexicana S," and that he lived in Mexico for over a year and hinted as to family ties via his "girl" as a reason for his access to multiple kilograms of cocaine.  Based on my training and experience, I believe that sources of supply based out of southern California with access to kilograms of cocaine and tens of thousands of counterfeit pills are affiliated with Mexican drug cartels and are working for/with them in illicitly transporting narcotics across the US/Mexico border.  Based on my training, experience, intercepted messages, and communication with other agents who have investigated VALDEZ, I believe VALDEZ is affiliated with Jalisco New Generation Cartel (CJNG).

32.    During their conversations, VALDEZ and the CS agreed to have VALDEZ ship the narcotics via USPS mail.  The CS attempted to have VALDEZ ship the narcotics to HUYNH's residence, however, VALDEZ did not give a location to where the narcotics would be

shipped.  In the subsequent days, VALDEZ and the CS discussed using Bitcoin as a method of payment for the narcotics transaction.  The CS and VALDEZ agreed to seven hundred dollars per one thousand pills transaction ($3,500 for five thousand pills).

33.     Shortly after, VALDEZ gave the CS a Bitcoin wallet account number to use for the transaction.  On August 14, 2025, a TFO sent approximately 0.02939000 Bitcoin (Approximately $3,500 USD) to VALDEZ's wallet.  VALDEZ let the CS know he had received the Bitcoin.  VALDEZ told the CS that the narcotics shipment would arrive soon.

34.     In the subsequent days, the CS attempted to obtain a tracking number from VALDEZ with negative results.  VALDEZ told the CS that he was overloaded on orders and that there might be a delay in the shipment.  On August 19, 2025, VALDEZ telephonically contacted the CS and stated that the narcotics shipments would arrive in a few days and asked the CS if he/she could pay VALDEZ's "boy" for letting him ship to his address.  In addition, VALDEZ again solicited the CS for a kilogram cocaine order.  Specifically, VALDEZ quoted the CS a price of eleven thousand per kilogram if the CS ordered at least ten kilograms.

35.     On August 22, 2025, VALDEZ telephonically contacted the CS and, in summary and relevant part, stated the narcotics would be available for pickup at around 2pm, and that the address for the pickup would be on Vine Street in San Jose.  At approximately 2:45pm, surveillance was set up on Vine Street.  At approximately 2:54pm, a TFO observed the CS vehicle park on Vine Street.  While the CS was parked, he/she contacted VALDEZ and stated that he/she was at the agreed upon meet location.  VALDEZ responded by saying the narcotics courier would meet the CS soon.  At approximately 2:58pm, the TFO observed an adult Hispanic male walk on the sidewalk on Vine Street towards the CS.  The TFO observed that the Hispanic male was carrying a white USPS box and that he handed it to the CS after they greeted each other.  Shortly thereafter, the Hispanic male walked away.

36.     The white USPS box had the shipping label removed and contained one individual plastic vacuum sealed style bag containing numerous small pills.  Due to the challenges associated with testing fentanyl in the field, investigators transferred the seized pills

18

to the Western Regional Laboratory, where subsequent analysis of the pills showed they contained a mixture and substance of fentanyl with a net weight of 553.9 g ± 0.2 g.

## CONCLUSION

37.     Based upon above above-described facts and circumstances, I submit that there is probable cause to believe that the below-named individuals committed the below-referenced federal offenses on the below-stated dates:

| Proposed defendant: | Offense: | Date: |
|---|---|---|
| William HUYNH | 21 U.S.C. § 841(a)(1), (b)(1)(A) – Distribution of and Possession with Intent to Distribute 100 Grams or More of a Mixture or Substance Containing a Detectable Amount of carfentanil, a Schedule II controlled substance, and an analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl) (One Count) | On or about January 10, 2025 |
| Jonathan LUCERO-PEACE | 21 U.S.C. § 841(a)(1), (b)(1)(A) – Distribution of and Possession with Intent to Distribute 100 Grams or More of a Mixture or Substance Containing a Detectable Amount of carfentanil, a Schedule II controlled substance, and an analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl) (One Count) | On or about February 26, 2025 |
| Alejandro PELAYO-GONZALEZ | 21 U.S.C. § 841(a)(1), (b)(1)(A) – Distribution of and Possession with Intent to Distribute 100 Grams or More of a Mixture or Substance Containing a Detectable Amount of carfentanil, a Schedule II controlled substance, and an | On or about February 26, 2025 |

| | analogue of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl) (One Count) | |
|---|---|---|
| Julio Jovan VASQUEZ-OCHOA | 21 U.S.C. § 841(a)(1), (b)(1)(A) – Distribution of and Possession with Intent to Distribute 50 Grams and More of Actual Methamphetamine (One Count) | On or about March 27, 2025 |
| Elias VALDEZ | 21 U.S.C. § 841(a)(1), (b)(1)(A) – Distribution of 400 Grams or More of a Mixture or Substance Containing a Detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, Commonly Known as Fentanyl (One Count) | On or about August 22, 2025 |

I request that the Court issue five (5) criminal complaints charging HUYNH, LUCERO-PEACE, PELAYO-GONZALEZ, VASQUEZ-OCHOA, and VALDEZ each with one count of the corresponding federal offense in the above chart.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

_____/s/_____
Joshua Serafin
Special Agent
Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on October _23, 2025.  This complaint and warrants are to be filed under seal.

_____
HON. NATHANAEL M. COUSINS
United States Magistrate Judge